1              IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION

3

4   IN RE:                    )   BK. NO:  20-33107-SGJ

5                             )

6   JOAN L. GILLHAM           )

7        D E B T O R.         )

8   _____

9   GILLHAM V. U.S. DEPARTMENT)  ADV. NO:  20-3000

10  OF EDUCATION              )

11

12            *  *  *  *  *  *  *  *  *  *

13            TRANSCRIPT OF PROCEEDINGS

14            *  *  *  *  *  *  *  *  *  *

15

16

17

18

19

20       BE IT REMEMBERED, that on the 12th day of December,

21  2022, before the HONORABLE STACEY G. JERNIGAN, United States

22  Bankruptcy Judge at Dallas, Texas, the above styled and

23  numbered cause came on for hearing, and the following

24  constitutes the transcript of such proceedings as hereinafter

25  set forth:

| | |
|---|---|
| 1 | <u>P R O C E E D I N G S</u> |
| 2 | THE COURT:  All right.  We have another |

matter, Gillham versus U.S. Department of Education.  This is

adversary 20-3000.  I will take appearances.

5      Good morning, Ms. Webb.

6           MS. WEBB:  Good morning, Your Honor.  Just a

couple of announcements.

8      I wanted to let you know we have a new U.S. Attorney,

Leah Simmington has been confirmed.

10          THE COURT:  I'm very happy to hear that.  I've

known her for a long time.

12          MS. WEBB:  Yes.  So we have a new U.S.

Attorney.  And we'll have a meeting this afternoon.

14     Secondly, I'd ask that my motion for continuance be put

first.  I have a witness, Chad Miller (sic), and he has a

meeting with the Under Secretary of Education in about an

hour.

18          THE COURT:  All right.  Well, I'm happy to

take that up first.

20     Who do we have appearing for plaintiff this morning?

21          MS. GILLHAM:  Good morning, Your Honor.  This

is Joan Gillham and I'm the plaintiff on this case.

23          THE COURT:  All right.  And are you acting pro

se?

25          MS. GILLHAM:  Yes, Your Honor.

1            THE COURT:  Okay.

2            MS. GILLHAM:  And I am an attorney and I am

3   acting pro se.

4            THE COURT:  All right.  Just confirming that

5   was still the case.

6        All right.  Well, there's been a request for a

7   continuance.  And so I'm going to hear that first.

8        So, Ms. Webb, you may proceed with that.

9            MS. WEBB:  Yes, Your Honor.

10       I would ask that we have Chad Keller, he is on remote,

11   testify.

12           THE COURT:  All right.  Mr. Keller, can you

13   turn off your -- or turn on your audio and video?

14       All right.  Mr. Keller, please raise your right hand.

15                  (The witness was sworn by the Court.)

16           THE COURT:  All right.  Thank you.

17       All right, Ms. Webb, go ahead.

18                  <u>CHAD KELLER</u>

19   The witness, having been duly sworn to tell the truth,

20   testified on his oath as follows:

21                  <u>DIRECT EXAMINATION</u>

22   BY MS. WEBB:

23       Q.   Mr. Keller, will you please state your name for the

24   record.

25       A.   Chad Keller.

1      Q.    And where are you employed?

2      A.    I'm employed at the United States Department of

3  Education.

4      Q.    And how long have you been employed with the

5  Department of Education?

6      A.    Approximately 30 years.

7      Q.    And what is your current position with the

8  Department of Education?

9      A.    I'm a supervisory program and management analyst.

10      Q.    Could you briefly describe to the Court what your

11  duties are as a supervisory management and program analyst?

12      A.    I supervise a team that coordinates activities with

13  the Department of Justice providing records and declarations,

14  mediation, settlements, explaining programs, that sort of

15  thing.

16      Q.    So you're familiar with the programs that Education

17  has under it; is that correct?

18      A.    Yes, ma'am.

19      Q.    Okay.  And you were a supervisor of Chris Bolander;

20  is that correct?

21      A.    Yes, I was.

22      Q.    Okay.  And he has left; is that correct?

23      A.    That's correct.

24      Q.    Okay.  And you have taken over this case, but may

25  reassign it to another specialist at one time; is that -- is

1   that a true statement?

2        A.   That's correct.

3        Q.   Okay.  Now, are you familiar with the programs that

4   concern forgiveness or recalculations of loans that have

5   recently been -- Education has been charged with on student

6   loans?

7        A.   Yes, I am.

8        Q.   Okay.  Could you tell the Court just briefly what

9   these programs are?  Like, you know, let's go over the Income

10  Driven Repayment, the Public Service, and then the

11  Biden/Harris Student Debt Relief.

12       A.   The Income Driven Repayments Program is a set of

13  various repayment programs in which payments are based on a

14  borrower's income.  Borrowers pay for a specified term and at

15  the end of that term the remaining balance is forgiven.

16       Q.   And how long is those terms normally?

17       A.   Public --

18       Q.   How long are those terms normally?

19       A.   It's 20 to 25 years.

20       Q.   Okay.  And even if they make 0 repayments, those

21  payments would be considered a payment, correct?

22       A.   That's correct.

23       Q.   And at this time, is the Department of Education

24  having its servicers recalculate payments under the Income

25  Driven Repayment Plan?

1        A.    The -- the -- Education has announced a one-time

2   adjustment to the Income Driven Repayment, what we call

3   payment counts, which is the number of months qualifying for

4   its cancellation.

5        Q.    What caused --

6        A.    So, yes, there has been an announcement.

7        Q.    What's -- what caused this recalculation to come

8   about?

9        A.    The -- the -- Education is going to do a one-time

10  adjustment to the payment counts in which they will count

11  some payments that were not previously qualifying.  These are

12  going to include periods of forbearance, if there's more than

13  12 consecutive months or 36 cumulative months in forbearance.

14  They will count payments that were made -- loans that have

15  been consolidated under payments that were made under the

16  previous loans, the underlying loans.  And they will count

17  payments towards cancellation that would

18  not -- in the past would not have counted because they were

19  made under other payment plans, or were not timely, or were

20  not in the full amount.

21       Q.    Okay.  So in essence, it expands the definition of

22  a payment to go towards the 25 years forgiveness?

23       A.    That's correct.

24       Q.    Okay.  And the --

25       A.    That's correct.

1       Q.     The Public Service Loan Recalculation Program, what

2  is that?

3       A.     So the Public Service Loan Forgiveness Program, or

4  what's known as PSLF, is a program in which borrowers who are

5  engaged in qualifying employment, which is employment at a

6  government agency or under a non-profit, the payment term is

7  reduced from 20 or 25 years to a 10-year term.  And then --

8  so that payments, qualifying payments concurrent with

9  qualifying employment for a 10-year period, or 120 months, it

10  doesn't have to be consecutive months, will result in

11  forgiveness of the remaining balance.

12      Q.     Okay.  And did the -- isn't there a limited program

13  that is recalculating payments and being more generous

14  towards what a payment would be towards this 10-year

15  forgiveness?

16      A.     Correct.  There -- there was a limited PSLF waiver

17  was the name of the program.  The program ended October 31st.

18  So borrowers had to apply prior to October 31st.  And it

19  adjusted the payments to include -- to include items to what

20  I described earlier for the IDR.  One time adjustment.  It

21  will count periods of forbearance.  It will count payments

22  made prior to the loan being consolidated.  Previously only

23  direct loan qualified -- or only payments made to direct

24  loans qualified for PSLF payments.  And now payments made to

25  Pell program loans that were consolidated into direct loans

1  will count.  So it's expanded the amount of qualifying

2  payments.

3       And it's the same sort of thing, PSLF in the past

4  limited qualifying payments to payments made under the Income

5  Driven Repayment Plans or a standard plan with a 10-year

6  amortization.  During the limited waiver, payments -- any

7  payment would be accepted, no matter the payment plan, or the

8  amount, or the timeliness of the payment.

9       Q.   Okay.  And this -- I think your testimony was this

10  closed on October 31st; is that correct?

11       A.   That's correct.

12       Q.   And when do -- does the servicer say that they

13  should be completed?  What's the report on completing the

14  applications that have come through?

15       A.   The -- the figures I've heard is that they've

16  received approximately 2 million applications and they expect

17  to work through those by the end of February.

18       Q.   End of February 2023?

19       A.   That's correct.

20       Q.   Okay.  And on the -- on the Income Driven Repayment

21  Plan, have -- have they started the recalculations of those

22  payments yet?

23       A.   They -- they're targeting July of 2023 to --

24       Q.   To have those calculated?

25       A.   -- to finish the calculating of those, yes.

1      Q.    Okay.  And could you tell the Judge about the

2  Biden/Harris Student Debt Relief Plan?

3      A.    Yes.  The Biden/Harris Debt Relief Plan amounts to

4  a calculation of student loan debt.  It's $10,000 for

5  individuals.  And then individuals who have received a Pell

6  Grant would receive $20,000 in cancellations.

7      Q.    Okay.  And this is just a debt forgiveness, no

8  payments required?

9      A.    That's correct.

10     Q.    Okay.  And have you looked to see if any of these

11  plans would be applicable to Ms. Gillham?

12     A.    Yes.  She would be eligible for all three of these

13  programs.

14     Q.    Okay.  And has she applied for the Public Student

15  Loan Forgiveness?

16     A.    Yes, she has.

17     Q.    And that would be the quickest one that could

18  determine if she's got all her loans discharged, correct?

19     A.    That's right.  It has the shortest payment term.

20     Q.    Okay.  And did you do a cursory review of her

21  account to see when the earliest possible time could be that

22  she would get discharged under the Income Driven Repayment

23  Plan?

24     A.    I did.  I did do a cursory review.  Ms. Gillham

25  received graduate loans, or professional degree loans, which

1    means that she would have a 25 year term.  Her loans entered

2    repayment in approximately 2006.  And these are the

3    underlying loans.  Her loans have since been consolidated.

4    But 25 years from when her loans would have started repayment

5    is approximately 2031.

6         Q.   Okay.  Okay.

7              MS. WEBB:  No further questions, Your Honor.

8              THE COURT:  All right.

9         Ms. Gillham, do you have questions for Mr. Keller?

10             MS. GILLHAM:  I do.

11             THE COURT:  You may proceed.

12             MS. GILLHAM:  First of all, let me make it

13   clear that this is -- I did not have any information from

14   DOE, from Attorney Webb.  I did not have Mr. Keller's

15   information or anyone at DOE's contact information.  The

16   first time his name or any contact information appeared was

17   on this witness list.  Because basically I have been

18   completely stonewalled from contacting anyone at DOE.  So

19   this is part of the problem.  This is the reason why we're

20   winding up having this hearing is because I'm not able to get

21   any information and I don't have a contact person at DOE.  As

22   a matter of fact, I was actually not able to even get a login

23   for weeks.

24

25                       (no omission)

CINDY SUMNER, CSR (214) 802-7196

```
 1                        CROSS-EXAMINATION

 2   BY MS. GILLHAM:

 3       Q.   So one of my questions is, Mr. Keller, in regards

 4   to emails that were sent in regards to June of last year --

 5   or June of this year that a review was supposed to be done,

 6   were you involved in that?

 7       A.   I -- no, I was not.  I was not part of that email

 8   chain.

 9       Q.   But -- so you did not review this.  Who was the one

10   that reviewed my account back in June, or was it reviewed in

11   June, as was -- as was told to me?

12       A.   Chris Bolander was the analyst assigned to your

13   case at that time.

14       Q.   So you don't know whether or not it was reviewed in

15   June or not?

16       A.   I -- I don't -- I mean, I'm not sure anybody

17   reviewed.  I think he did look at your account and I think he

18   did make assessments.

19       Q.   But you don't know and you don't have any notes of

20   that?  There's not any documentation of that?  Is that what

21   I'm understanding?

22       A.   Well, I've read the emails.  It looks like he did

23   make an assessment.

24       Q.   Okay.  But doesn't DOE make any kind of notes on

25   when they review anything in the file, or is it just blank?
```

1    A.   I think -- I -- I don't think we would necessarily

2  normally enter that into our system of records, no.

3    Q.   So would there have been any kind of documentation

4  of his communication with an email to someone, or phone call,

5  or anything, or is there just no documentation to verify that

6  this even happened in June?

7    A.   I believe he would be able to conduct that review

8  by looking at systems that he had access to.

9    Q.   So nobody knows?  There's no documentation, there's

10  no trail, there's no nothing from June whether it happened or

11  it didn't happen; is that what I'm hearing you say?

12    A.   It's a common practice for us to look at our

13  computer system records.  So I think it's a fair assumption

14  that he looked at the system records.

15    Q.   Okay.  But -- okay.  So basically there's no way to

16  prove, or there's no evidence, documentation evidence about

17  if there was even any review in June from him?

18    A.   Well, I think he states in his email that he

19  reviewed under what would be our common practices.  So I

20  think it's a fair assumption.  It's not hard to look at our

21  systems and to make that sort of assessment.

22    Q.   Okay.  And then are you familiar with the changes

23  that are supposed to happen or be effective in July of next

24  year, July of 2023?

25    A.   I have seen information regarding -- I think you're

13

1   referring to the regulatory changes?

2       Q.   They would be -- correct.  The final regulations to

3   expand and improve targeted debt relief programs.

4       A.   I've seen -- I've seen information related to that,

5   yes.

6       Q.   Do you know anything about those, or if those are

7   going to be anything that's going to be applicable to these

8   loans?

9       A.   I think you might have to be more specific in your

10  question.  I think -- I think, yes, it could -- it could

11  impact -- your case.  Your PSLF application was submitted

12  prior to October 31st, so it will be reviewed under the

13  limited waiver.  And a lot of those regulatory changes made

14  some of the provisions in the waiver permanent.  Although

15  there's a gap between the expiration of the waiver and then

16  the implementation of the regulations in July.  But it was an

17  effort to make some of those provisions permanent.

18      Q.   Okay.  And then one of the other questions I had is

19  in regards to the cancer, I believe was it the cancer

20  deferment that was scheduled for -- as part of the July 2023

21  regulations, as well?

22      A.   I -- I am -- I would have to check the regulations.

23  I'm not -- I'm not up on that one.  Sorry.

24      Q.   And then they can -- in regards to the IDR, the

25  PSLF, obviously the Debt Forgiveness, the Biden/Harris -- the

1   Biden/Harris thing is hung up in the courts, but the IDR and

2   the PSLF are not, correct?

3       A.   That's correct.

4       Q.   And then they can wind up even being kind of, I

5   don't know if the correct word is, combined?  There's a way,

6   from what I understand about these programs, intertwining

7   with each other, or interworking with each other.  Can you

8   explain that if they're -- how that works?

9       A.   Yeah.  I think -- I think they're intertwined, at

10  least in my mind, in the sense that the PSLF program has

11  requirements of repayment concurrent with qualifying

12  employment.  So it does engage the IDR program.  Norm -- a

13  lot of loans have a 10-year term.  So if you pay under the

14  standard plan, which is a 10-year amortization, you would pay

15  off your loan before any cancellation.  So a lot of borrowers

16  to benefit from PSLF enroll in the Income Driven Repayment

17  Plan.  They get a lower monthly payment.  And then after 10

18  years, the remaining balance is cancelled.  I think that's

19  kind of the basic concept of the PSLF program.  The

20  qualifying payments have been expanded during the one-time

21  recount.  And then the regulatory change is coming in July.

22  But I think that's the basic concept of the two programs

23  being intertwined.  You can think of the PSLF program as

24  being part of the Income Driven Repayment Program, and then

25  the -- you know, the term's just shortened from 20 or 25

1  years to 10 years.

2      Q.   And are you -- I just lost my train of thought.

3       How is the -- how are my current loan -- how is it

4  reporting on the credit report?

5      A.   I believe you're being reported as current.

6      Q.   Is it reporting as in forbearance, or is it

7  reporting in -- as in IDR?  Or what is the status, in your

8  understanding?

9      A.   I would have to check on the exact reporting.  But

10  I believe -- I believe accounts right now during the payment

11  pause are being reported as current, paid as agreed.

12      Q.   Okay.  Because it's actually being reported as in

13  forbearance, is what it's being reported as.

14      A.   I would have to verify that.

15      Q.   It's showing, actually, late payments.  And that's

16  part of the issue that is why we're here today is because

17  it's being -- it's showing as in forbearance and it's showing

18  as late.

19      A.   I can verify -- I mean, we can verify what the

20  credit reporting is.  There's also -- there's always the

21  possibility that what's reporting is not what's appearing on

22  your credit report, too.  And there is a process to dispute

23  that with the credit bureaus.

24      Q.   Well, it's the way that you guys are reporting it

25  over.  I mean obviously they can't -- they can't change what

16

1  you guys are reporting.  I mean, you know, they can't change

2  IDR versus forbearance --

3            THE COURT:  Okay.  Ms. Gillham --

4       Q.  -- those are two different things.

5            THE COURT:  Ms. Gillham, I know you're pro

6  se, but you are an attorney, correct?

7            MS. GILLHAM:  I am.

8            THE COURT:  All right.  So this -- this has

9  kind of strayed beyond question and answer cross-examination.

10  It's like you're arguing with the witness or engaging in

11  discovery.  So I'm going to ask you to kind of wrap it up and

12  stick to what we're here on today.  All right?

13            MS. GILLHAM:  Okay.

14       Q.  I had one other question.  Oh, are you familiar

15  with under the July 2023 regulations the -- the -- the change

16  for IDR -- or PSLF for the contractor versus employer?

17       A.  Yes.  So currently qualifying employment is

18  determined by -- it's really determined by who you work for,

19  not the kind of work you do, I think is one way it's

20  frequently described.  So -- so a contractor, it depends who

21  is actually employing you.  So if you're doing contractor

22  work for a qualifying employment, it may or may not qualify,

23  depending upon who the -- who the -- what the contracting

24  entity is.  There are some changes coming in July to allow

25  people that are contractors that hold positions that that

1  employer is required by law to employ contractors to be

2  eligible for PSLF employment.

3             THE COURT:  All right.  Anything else?

4             MS. GILLHAM:  No further questions.

5             THE COURT:  All right.  Any redirect,

6  Ms. Webb?

7             MS. WEBB:  No, Your Honor.

8             THE COURT:  All right.

9             MS. WEBB:  Could we excuse Mr. Keller, so he

10  can go to -- to his meeting with the Under Secretary?

11             THE COURT:  We certainly can.

12       Mr. Keller, thank you.  You are excused.

13             MS. WEBB:  Thank you, Mr. Keller.

14             THE WITNESS:  Thank you.

15             THE COURT:  All right.  So, Ms. Webb, as I

16  understand it, you're wanting a continuance to April; is that

17  correct?

18             MS. WEBB:  Yeah.

19             THE COURT:  Okay.

20             MS. WEBB:  Because -- well, I want to make a

21  correction to the Court.

22             THE COURT:  Okay.

23             MS. WEBB:  I did make 26(a) disclosures.  I

24  did have Chris Bolander listed as a witness.  But

25  Ms. Gillham's objection that I hadn't given her Chad Keller

1   or anybody else she could talk to, she does not need to be

2   talking to them.  They're a represented party.  She needs to

3   go through me when it comes to this case.  When it comes to

4   credit bureaus and getting PIN Numbers, she needs to go to

5   DOE as any normal person would and not through me.  So that

6   is my response there.

7         But, yes, I am asking -- we're hoping -- the one that's

8   going to be calculated quicker is going to be the Public

9   Service Loan Forgiveness one, which we think will be in

10  February of 2023.  I do know that she has applied for it.

11  And Mr. Keller did review the application.  There are going

12  to be some things she has to supplement on it.  So hopefully

13  her's will be decided by 2023.  But I just had asked for six

14  month because -- I really wanted a stay so that it would

15  maybe not count towards your time and give us time to get

16  these programs through, because they very well may affect

17  Ms. Gillham.  But she felt like I was dragging my feet and

18  this would benefit me, so she would not agree to a stay, so I

19  did this continuance.

20              THE COURT:  All right.

21         Well, Ms. Gillham, I'll tell you from where I sit, this

22  feels like a no brainer.  It looks like, you know, if we let

23  this play out, there's a very good chance you might get

24  forgiveness under at least the Public Service Loan Program,

25  maybe one or two others.  So why wouldn't we let this ride

1   out until April and see if we have an easier path to the

2   remedy you're seeking?

3          MS. GILLHAM:  Your Honor, first of all, I have

4   a conflict in April.  But secondly, I am not opposed to a

5   continuance.  I have said all along I'm not opposed to the

6   continuance.  And I definitely want to let this play out.

7   And I'm trying to work it out and trying to settle it and

8   work out everything through DOE.  The problem is, Attorney

9   Webb refuses to provide any information.  And every time I

10  ask her a question, she won't answer me.  She gives me wrong

11  information.  I don't have any contacts at DOE.  I've asked

12  for meetings with different people at DOE.  She has refused.

13  She has continued to obstruct.  The whole thing with me

14  trying to apply with the PSLF, I couldn't get a PIN for two

15  weeks from DOE.  Numerous emails.  Took me contacting

16  (inaudible word) Requirements Office before I finally was

17  able to get the PIN.  That's the kind of obstruction that I'm

18  getting.  So that's the whole issue.

19      I'm more than willing to let this play out.  But I

20  can't have an attorney on the other side who obviously I

21  can't contact DOE.  She just made that very clear, because

22  she represents them.  But, yet, she refuses to provide the

23  information.  And the little bit of information that I've

24  gotten was wrong.  And that was easily disputable based on a

25  public information release.  So this is the whole entire

1   situation.  I mean, I've tried, and tried, and tried, but she

2   continues to obstruct.  And this is -- this is -- that's the

3   reason why I filed the motion to compel is because, you know,

4   I'm the one that's sitting here dealing with this credit

5   reporting issue from DOE.  And there's nobody to contact to

6   get it resolved, because she refuses.  That's the reason why

7   we're here today is because of her continued obstruction.

8           THE COURT:  All right.  Well --

9           MS. GILLHAM:  It appears that she has very

10  strong personal feelings about this.  And it's obstructing

11  her professionalism.

12          THE COURT:  Okay.  These are really -- I don't

13  know if they're harsh words, they're passionate words, but I

14  will let you know that I -- I'm not used to seeing Ms. Webb

15  act in the way you're describing.  She does not have a

16  history of anything you're saying here.  I just wonder if

17  this is not a matter of two or three things going on.  One, I

18  imagine the system is, I mean, inundated, you know,

19  overloaded, if you will, of people in your same shoes who are

20  trying to get information.  I forget what the exact testimony

21  was of Mr. Keller, how many millions of applicants -- I think

22  he said 2 million applications had been received under the

23  Public Service Loan Program that he thought you were most

24  likely to fit into.  So I can certainly, you know, understand

25  that, you know, sometimes it just takes time when you have so

 1    many people who are trying to apply for these programs.

 2          Second thing, I mean, we heard that Mr. Bolander, Chris

 3    Bolander left recently.  So you had a change in personnel.

 4    You know, that's got to affect the process here.  But, you

 5    know, I note that you filed this case right before the

 6    pandemic started.  And that couldn't have helped matters as

 7    far as people being able to quickly address information

 8    requests.  So I think we need to just kind of cool down here.

 9    And, you know, Ms. Webb doesn't like coming to court and

10    hearing what she's heard.  So I think if we will just give

11    this a continuance, it's going to be in everyone's benefit,

12    especially your's.

13          Ms. Gillham, you're a lawyer, so you probably know that

14    when it comes to the Bankruptcy Code Section 523 and trying

15    to get forgiveness of your student loan under the Bankruptcy

16    Statute, you know, the 5th Circuit and other Circuits,

17    there's a lot you have to go through and prove.  It's an

18    expensive, difficult trial.  So, oh, my goodness, if there's

19    a chance that these federal programs might allow forgiveness

20    of your debt, we've got to let that play out.  It's in your

21    benefit.  It's in everybody's benefit.  Okay?

22          So I am going to grant the continuance.  Shall we make

23    it May?  You said you had a problem in April?

24                MS. GILLHAM:  Yeah, May is fine.  And like I

25    said, you know, Your Honor, I definitely don't have any

1    problems with the continuance.  And, you know, I understand

2    the working through everything.  The problem is being

3    stonewalled in the process and making sure that I can be able

4    to apply as they roll out new things, et cetera, et cetera.

5                 THE COURT:  Okay.  I'm going to continue the

6    trial docket call to May.  But I'm going to suggest we also

7    continue the motion to compel to a date in early March,

8    because, you know, hopefully you've gotten the word in

9    February, okay, wonderful, you qualify, or if by chance we

10   still don't know at that point, we can look at your

11   information requests and see which ones still have been

12   unaddressed, if any.  Maybe you've gotten your information by

13   then.  But I really -- I think the main focus needs to be

14   right now on you getting information to the Department of

15   Education that they might need to assess whether you fit into

16   some of these forgiveness programs.

17        So, Traci, can you look at our calendar, let's say the

18   first week in March, we'll give a continued hearing on the

19   motion to compel.  And we'll just see where we are in this

20   whole informal process of seeing if she fits in one of these

21   programs.

22        Can you give a placeholder right now?

23              MS. ELLISON:  Yes.  March 2nd, 2:30 p.m.

24              THE COURT:  Everybody good with that?

25   I know it's a long way away --

1              MS. GILLHAM:  Yes, Your Honor.

2              THE COURT:  -- as far as knowing with

3    certainty your calendar, but let's plug it in.

4              MS. WEBB:  Your Honor, just to let you know,

5    I'm retiring in March.

6              THE COURT:  Oh, my.  Okay.

7              MS. WEBB:  And I may not be at the office in

8    March.

9              THE COURT:  Okay.

10             MS. WEBB:  So maybe that will, you know, with

11   it being set out that far, we do  have someone who is going

12   to succeed me.

13             THE COURT:  Okay.

14             MS. WEBB:  And maybe Ms. Gillham can get along

15   with them, since she doesn't appear to get along with me.

16             THE COURT:  Okay.  Well, we'll go ahead and

17   use March 2nd at 2:30.  And I just want to make sure we don't

18   come back on March 2nd and, you know, zero progress has been

19   made.  And what I'm most concerned about is maybe Ms. Gillham

20   getting information about what she needs to submit to be

21   considered for these programs.  It sounded like from

22   Mr. Keller that maybe -- or I can't remember who said it.

23   There's going to be information she has to provide, right,

24   and maybe some applications she has to file.  I don't know.

25             MS. WEBB:  With my review from Mr. Keller just

1  recently, we did check.  And she did make the October 31st

2  deadline.

3                    THE COURT:  Okay.

4                    MS. WEBB:  She does have some Public

5  Service -- in the application, you have to state what dates

6  you worked for who and are they a qualifying employer.  And

7  then there's a little certification that each employer is

8  supposed to certify that she did, in fact, work.

9                    THE COURT:  Okay.

10                   MS. WEBB:  She does have the years.  She

11 doesn't have the certifications on there.

12                   THE COURT:  Okay.

13                   MS. WEBB:  I -- from what I understand,

14 Mr. Keller looked this morning and he said it looks like that

15 they -- Education is not doing this, MOHELA is, which is the

16 servicer.  But he looked and it looks like they're going to

17 be corresponding with her either denying it or denying it

18 until she gets more information to them because there wasn't

19 an employer certification on those.  And she's also claiming

20 one them is 10 years as a contractor, or whatever, which is

21 the reason why I understood why she was asking those

22 questions, too.  But MOHELA will be doing that.  We can --

23 Mr. Keller, or whoever, can check and see where it is in the

24 process.  But we can't do it for her, because it is the

25 servicer that has the expertise to do this stuff.  And we

25

1  don't have the staff.

2              THE COURT:  Okay.  Well, I -- I don't have a

3  clear feel.

4      Ms. Gillham, do you know the human beings to coordinate

5  with?  I mean, as Ms. Webb points out, if it's regarding --

6              MS. GILLHAM:  No, I don't.

7              THE COURT:  If it's regarding this lawsuit, it

8  really needs to be through the lawyer, Ms. Webb.  But the

9  mechanics of doing your paperwork to fit into these programs,

10  then you obviously deal directly with -- do you know who it

11  is, you know --

12             MS. WEBB:  It should be MOHELA.

13             THE COURT:  MOHELA.  Does that tell you what

14  you need to know, or --

15             MS. GILLHAM:  That's the problem, Your Honor,

16  is I don't have -- because of the fact that I am an attorney

17  and the fact that they are represented, obviously I have been

18  prohibited from contacting DOE.  So that's where the whole

19  issue has been is I can't pick up the phone and call them,

20  obviously, because of the fact that they're represented.  So

21  that's been part of the whole issue.

22             THE COURT:  Okay.  Is there some website she

23  goes to that, you know, a person can follow --

24             MS. WEBB:  Yes.  Like any --

25             THE COURT:  -- the links?

1                MS. WEBB:  Like any other student loan

2  borrower.  She'll probably get a letter from MOHELA.  They'll

3  probably give her an account or whatever.  She needs to deal

4  through them this loan forgiveness.  She needs to deal

5  through them to get her PIN Number.  Or she needs to deal

6  through them about the credit bureau.  And, you know, I do

7  know the answer to that, if you'd like to know.

8        We put them in bankruptcy forbearance, DOE does, when

9  they have an adversary and it hasn't been determined to make

10  darn sure they don't violate the automatic stay.

11                THE COURT:  Okay.  There you go.  There's the

12  answer to that.

13        So at this point it's just a matter of Ms. Gillham to

14  make sure she's getting her PIN Numbers, she's filling out

15  the right paperwork to get into these programs and get all of

16  the information in for these programs.

17        She just needs to go to the website and follow the

18  links?

19                MS. WEBB:  Right.  Just like any other student

20  loan borrower.

21                THE COURT:  Any question about the website

22  address, Ms. Gillham?

23                MS. GILLHAM:  I have the website address.

24  It's just like I can't pick up the phone and call or email

25  them or anything like that.  And that's -- that's the whole

1   entire issue.  I have the website.  And from what I recall in

2   regards to this whole thing with the certification on the

3   employer, I would have to look at the form, but I think there

4   was a box on the form that said something about them doing

5   it.  So I'll have to research that.  But, again, see these

6   are -- this is the whole question on these logistical pieces,

7   who can I contact so that I'm not creating, you know,

8   reaching out directly to DOE when they're represented?

9   That's -- it's working through these logistical things that

10  the website is not going to resolve.

11              THE COURT:  Okay.  Well, there are millions of

12  student loan borrowers out there trying to wade through these

13  same issues.  And I can't give you any special, you know,

14  privilege just because you're in bankruptcy.  What I can do

15  is I can continue this lawsuit to May, which I think is of

16  tremendous benefit to you, rather than making you go through

17  the prove-up hoops in the Bankruptcy Code.  You know, it

18  sounds like it might be a much easier path, if you fit into

19  one of these programs.  But, again, questions or discussions

20  about the lawsuit go through Ms. Webb or whoever succeeds her

21  when she retires in March.  But as far as the student loan

22  programs, I mean, you'll have to go through the website like

23  every other person going through this.  And, you know, again,

24  hopefully we're going to hear something good when we come

25  back in March.  And I'll look for forms of order, Ms. Webb.

1           MS. WEBB:  Okay.  I will.

2       And, Your Honor, just one more thing.  In May, this

3   probably won't be ripe because if she is discharged, it's

4   gone.  If it isn't, then we need to start discovery.  And I

5   have not done that discovery because of COVID.  You know, I

6   normally require five years worth of bank statements, income

7   tax returns, and stuff like that.  So it is anticipated we

8   will do another continuance to allow normal discovery, if we

9   have some funds leftover.

10          THE COURT:  Okay.  So perhaps we should call

11  the May setting just a status conference/scheduling

12  conference --

13          MS. WEBB:  Okay.

14          THE COURT:  -- more than trial docket call.

15          MS. WEBB:  Okay.

16          THE COURT:  Okay.  So we'll look for forms of

17  order on these matters.  Thank you, Ms. Webb.

18          MS. WEBB:  Thank you.

19          THE COURT:  And thank you, Ms. Gillham.

20          MS. GILLHAM:  Thank you, Your Honor.

21              (End of Proceedings.)

22

23

24

25

1                    C E R T I F I C A T E

2            I, CINDY SUMNER, do hereby certify that the

3    foregoing constitutes a full, true, and complete

4    transcription of the proceedings as heretofore set forth in

5    the above-captioned and numbered cause in typewriting before

6    me.

7

8

9

10

11

12

13

14                                /s/Cindy Sumner

15                        _____

16                        CINDY SUMNER, CSR #5832
                          Expires 10-31-2024
17                        Cindy Sumner, CSR
                          5001 Vineyard Lane
18                        McKinney, Texas 75070
                          214 802-7196
19

20

21

22

23

24

25